# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 14, 2011　　　　Decided December 9, 2011

No. 08-3051

UNITED STATES OF AMERICA,
APPELLEE

v.

QUEEN NWOYE,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No.1:07-cr-00012)

*A. J. Kramer*, Federal Public Defender, argued the cause and filed the briefs for appellant. *Neil H. Jaffee* and *Jonathan S. Jeffress*, Assistant Federal Public Defenders, entered appearances.

*Suzanne G. Curt*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Ronald C. Machen, Jr.*, U.S. Attorney, and *Roy W. McLeese III*, *Elizabeth Trosman*, and *Frederick W. Yette*, Assistant U.S. Attorneys.

Before: TATEL and BROWN, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the court filed by *Circuit Judge* BROWN.

Dissenting opinion filed by *Circuit Judge* TATEL.

BROWN, *Circuit Judge*: Appellant, Queen Nwoye ("Nwoye"), was convicted of conspiring with a male accomplice, Adriane Osuagwu ("Osuagwu"), to extort money from Dr. Ikemba Iweala ("Iweala"), by threatening to expose their brief extramarital affair to his wife and the medical licensing board. At trial, Nwoye's attorney proffered evidence in support of a duress defense. The district court permitted Nwoye to testify as to the facts of her alleged duress, but declined to instruct the jury about the defense. Nwoye now appeals her conviction on the grounds that the district court improperly denied her a duress instruction and improperly instructed the jury on venue. Because Nwoye is not entitled to a duress instruction and because there was no plain error regarding the venue instruction, we affirm.

I

After Nwoye, a native of Nigeria, came across Dr. Iweala's name on prescriptions she handled as a pharmacy technician, she left phone messages pretending to be a relative of his in order to get his attention. She succeeded, and for a few months in 2002, Nwoye and the doctor were lovers. The romantic part of their relationship ended amicably, and Nwoye and Iweala remained friendly. Nwoye, who had earned an accounting degree in Nigeria, was married and had children. She began attending nursing school sometime after her affair with Iweala and has since graduated and is a registered nurse.

In the summer of 2005, Nwoye and her husband agreed to a separation. Around the same time, she met Osuagwu and

began a romantic relationship with him. In February of 2006, Nwoye told Osuagwu about her affair with Iweala. At Osuagwu's urging, Nwoye telephoned Iweala and asked him to speak with Osuagwu, who she introduced, using a pseudonym, as her "cousin." This conversation began a series of extortion demands with which Nwoye urged Iweala to comply. In fact, the plot spanned two months and featured a series of five separate demands for money, three instances in which Nwoye herself collected money from Iweala alone, one coordinated and successful effort by Nwoye and Osuagwu to extract even more money by lying to Iweala and insisting Nwoye had kept all of the money for herself, and one particularly dramatic incident in which Nwoye lured Iweala to meet her in the parking lot of Providence Hospital in Washington, D.C. by falsely claiming a desire to return his money and to renew their sexual liaison. That night, she went with Osuagwu to the hospital parking lot, and once she and Iweala were alone in her car, *in flagrante delicto*, Osuagwu took photographs to use as leverage, at which point Iweala fled the car. The extortion did not come to an end until the conspirators had extracted $185,000; Iweala then confessed his indiscretions and contacted the FBI. Shortly thereafter, Nwoye returned to her husband and contacted a law enforcement agency in Nigeria, the Economic and Financial Crime Commission ("EFCC"), to report Osuagwu's criminal activity.

At trial, Nwoye testified she did not want to extort money from Iweala but that, throughout this extortion scheme, Osuagwu physically abused her and forced her to participate. At his insistence, she wore a Bluetooth earpiece so the two could be in constant telephone contact and so Osuagwu could monitor her conversations and activities. She also claimed that Osuagwu said he was an FBI agent, as well as a nurse. He threatened to kill her if she failed to cooperate. She feared

contacting the police because she thought Osuagwu could use his supposed law enforcement connections to discover her betrayal and retaliate against her.

Based on these alleged threats, Nwoye's attorney requested the jury be instructed on a duress defense.[1] A defendant is only entitled to an instruction on a theory of duress if there is "sufficient evidence from which a reasonable jury could find" for the defendant on that theory. *United States v. Akhigbe*, 642 F.3d 1078, 1083 (D.C. Cir. 2011). The district court found Nwoye's testimony insufficient to support the instruction. We review this determination *de novo*. *United States v. Kayode*, 254 F.3d 204, 214 (D.C. Cir. 2001).

II

The affirmative defense of duress is only available to a defendant who shows she acted "under an unlawful threat of imminent death or serious bodily injury." *United States v. Bailey*, 444 U.S. 394, 409 (1980). The threat must be both grave and so "immediate," *United States v. Gaviria*, 116 F.3d 1498, 1531 (D.C. Cir. 1997), as to preclude "any reasonable, legal alternative to committing the crime," *United States v. Jenrette*, 744 F.2d 817, 820 (D.C. Cir. 1984); *see also United States v. Rawlings*, 982 F.2d 590, 593 (D.C. Cir. 1993) ("[A] defendant cannot claim duress when he had, but passed up, an opportunity to seek the aid of law enforcement officials."). A defendant who has the opportunity to avoid committing a crime, either by contacting police or by otherwise removing herself from a threatening situation, cannot seek to excuse her criminal conduct by claiming to have acted under duress.

---

[1] Before Nwoye testified, the government objected to the proposed instruction but stated it would nonetheless not prevent Nwoye from testifying to these threats or her alleged abuse.

This Court has affirmed denials of the duress defense even in quite harrowing situations. In *Gaviria*, we denied the defense for a defendant whose teenage daughter was in the physical custody of a co-conspirator, with a history of physical abuse against the daughter, who coerced the defendant's cooperation for thirteen months "by reminding him that [the daughter] was 'in his hands.'" 116 F.3d at 1531. But, because of the defendant's "ample opportunities" to inform his daughter, other members of his family, his daughter's school principal, or any number of other people about that threat, we concluded the defendant's claim of duress "border[ed] upon the frivolous." *Id.* The requirement of immediacy is also not equivocal. A defendant who had just two days between the receipt of a threat and the inception of the conspiracy during which he could have contacted the authorities or sought help failed to meet it. *Jenrette*, 744 F.2d at 821.

Our sister Circuits have imposed a similarly high bar. In *United States v. Alicea*, the Second Circuit denied the defense to female defendants forced to transport drugs after having been raped by their captors, told they were under constant visual surveillance during a nine-hour plane flight, and threatened with the deaths of their families if they failed to cooperate because they could have "complain[ed] to the cabin attendants" during the flight or sought assistance from Immigration and Customs officers after landing. 837 F.2d 103, 105–06 (2d Cir. 1988); *see also R.I. Recreation Ctr. v. Aetna Cas. & Sur. Co.*, 177 F.2d 603, 604–05 (1st Cir. 1949) (affirming denial of defense for defendant accosted by armed men who drove him at gunpoint to his office building, ordered him to take money out of his safe, and threatened they would "take care of" his family if he did not comply, because the threat was of "future unspecified harm" and because he was

free in the minutes he was alone in the office building to call someone for help).

Without denying the compelling nature of Osuagwu's alleged threats or of the abuse Nwoye claims to have received, Nwoye's testimony falls far short of the duress claimed in, and ultimately denied by, our precedents. She had ample opportunities to notify law enforcement either directly or indirectly or, even more basically, to avail herself of "reasonable, legal alternative[s] to committing the crime," *Jenrette*, 744 F.2d at 820, by extricating herself from the conspiracy. Three days a week, she attended nursing school classes or worked at a hospital, and was physically separated from Osuagwu. While there, she could have contacted police herself or asked teachers or classmates to do so or to help her escape Osuagwu's control. She ordinarily met with Iweala alone for at least a few minutes when she collected money from him, and on one occasion she went to collect money from him entirely on her own. She could have told him then that she was being coerced, that she needed help, and that he should contact authorities himself and put an end to the unlawful activity.[2] She let these opportunities pass.

Finally, Osuagwu spent nearly two weeks in California, thousands of miles away from Nwoye. During that time, their only contact was by telephone. And though Nwoye testified they were in constant contact, she could have turned off the phone, talked to her husband, her friends, or the police, and fled to safety with her children before Osuagwu could even

---

[2] Nwoye claimed at trial that she tried to confess to Iweala once, and that he would not listen to her. But this attempt came weeks into the extortion plot and after the parking lot incident, which demonstrated to Iweala the likely hollowness of any promise by Nwoye to renounce her role in the plot.

get through airport security.[3]  And even if Nwoye wanted to avoid an open breach of her arrangement with Osuagwu, she could have explained any gap in their cell phone contact as the result of spotty cell coverage, a trip on the Metro, or a dead battery.  She failed to take any advantage of Osuagwu's absence.  A defendant with such "countless opportunities to contact law enforcement authorities or [to] escape the perceived threats" cannot as a matter of law avail herself of the duress defense.  *United States v. Scott*, 901 F.2d 871, 874 (10th Cir. 1990).  Compared to the duress claims of defendants who had only days, *Jenrette*, 744 F.2d at 821, or even minutes, *Alicea*, 837 F.2d at 106, in which they could have sought help, Nwoye's claim of duress is incredibly thin.  If the attempts of those defendants to avail themselves of a duress defense failed, then *a fortiori*, Nwoye's attempt must fail as well.

Nwoye counters that she was especially vulnerable as a recent immigrant who believed her fate was in the control of a corrupt law enforcement agent.  She relies on the Ninth Circuit's decision in *United States v. Contento-Pachon*, 723 F.2d 691 (9th Cir. 1984), for the proposition that this belief excuses her failures to seek help or to extricate herself from the conspiracy.  *Contento-Pachon* involved a defendant who transported drugs from Colombia to the United States and who was permitted to claim duress, in spite of his failure to contact police.  The court found the evidence sufficient for a

---

[3] That this was a viable option is borne out by the fact that Nwoye eventually did precisely that even though nothing had changed with regard to the threat Osuagwu posed: Nwoye simply testified that her "consciousness came back," at which point she returned to her husband's home and from there contacted the EFCC in her home country of Nigeria.  Tr. 440, Nov. 1, 2007.  And in fact, a month after that, Nwoye voluntarily flew to California to visit Osuagwu, apparently no longer concerned he would harm her.

jury to determine he reasonably believed that he was being constantly watched and that Colombian and Panamanian police were corrupt and were "paid informants for drug traffickers." *Id.* at 694.

Assuming *Contento-Pachon* is applicable, the critical question is whether Nwoye's belief was objectively reasonable, *see United States v. Posada-Rios*, 158 F.3d 832, 873–74 (5th Cir. 1998), taking into account her particular circumstances. Thus, although we take it as true that Nwoye believed Osuagwu when he told her he was an FBI agent, we must still decide whether the belief itself and the inferences she drew from this belief—namely, that all police forces were corrupt and that she therefore had nowhere to turn for help— were reasonable. We are not persuaded that a jury could reasonably so find. First, our opinion in *Gaviria* suggests a defendant must "provide[] . . . concrete evidence in support of [an] assertion" that the authorities are corrupt and therefore not an available avenue of escape. 116 F.3d at 1531; *accord United States v. Jankowski*, 194 F.3d 878, 883 & n.3 (8th Cir. 1999) (rejecting duress defense where defendant's "only evidence of having no reasonable, legal alternative was that he had a subjective belief . . . that going to the police would be futile" and observing that the "well-documented circumstances" of corruption in the Colombian police force are lacking with respect to police in this country absent specific evidence); *United States v. Riffe*, 28 F.3d 565, 568 (6th Cir. 1994), *abrogated on other grounds by Dixon v. United States*, 548 U.S. 1 (2006) (accepting duress defense only because defendant supported his belief in danger of contacting authorities with personal prior experience of having been stabbed while in protective custody); *Scott*, 901 F.2d at 874 (rejecting defendant's "amorphous belief" of futility of contacting police as "neither substantiated by the evidence nor defined as to its scope and coverage"). Nwoye

has provided no evidence of corruption beyond her conclusory assertion that police and FBI "all work together for the government" and that anything she told the authorities would find its way to Osuagwu. Tr. 417, Nov. 1, 2007.

Second, we squarely held in *Gaviria* that *Contento-Pachon* is distinguishable from cases where a defendant "had access to a number of" people other than allegedly corrupt police officers, including relatives, and from cases involving conspiracies lasting for months at a time rather than for one "single flight," which by their length present more opportunities for escape. 116 F.3d at 1531–32. In other words, once a defendant has options other than approaching law enforcement specifically, and the time in which to pursue those options, it is no longer objectively reasonable not to do so. In fact, even the Ninth Circuit distinguished *Contento-Pachon* in a case involving a defendant who was not under constant visual surveillance by his coercers and who was involved in a conspiracy that lasted for more than a year and that had "times of inactivity," finding his claim that he had "no reasonable means of escape" fatally flawed as a result. *United States v. Jennell*, 749 F.2d 1302, 1306 (9th Cir. 1984). Duress thus requires more than simply having no opportunity to contact the police in particular; rather, it requires that a defendant have *no* "legal alternative to committing the crime." *Jenrette*, 744 F.2d at 820.

Finally, Nwoye suggests the mere whiff of battered woman syndrome (BWS) arising from these facts should alter the duress determination or the application of *Contento-Pachon*. Nwoye was permitted to testify at length about the facts of her abuse, but she did not present BWS as a theory of defense at trial. In fact, although Nwoye described some threats and physical abuse, her theory is devoid of the other usual indicia supporting a BWS defense—expert witnesses

testifying to the effects of isolation, financial dependence, or estrangement from family members. *E.g. United States v. Marenghi*, 893 F. Supp. 85, 94–95 (D. Me. 1995). Indeed, as discussed earlier, Nwoye had many alternative sources of protection and support.

Like the defendants in *Gaviria* and *Jennell*, and unlike the defendant in *Contento-Pachon*, Nwoye had access to relatives, classmates, and teachers with whom she could seek refuge. She was not under constant visual surveillance. The conspiracy in which she participated lasted for months. Even if we found Nwoye's belief regarding the dangers of contacting police objectively reasonable, it would not excuse her failure to simply seek sanctuary with others, particularly in the weeks when Osuagwu was thousands of miles away. Because she had several reasonable options, no reasonable juror could have found Nwoye lacked a legal alternative to committing the crime. The district court correctly declined to instruct the jury on the affirmative defense of duress. *Bailey*, 444 U.S. at 415 (requiring evidence to "meet a minimum standard as to each element" of a defense in order for the jury to be instructed on that defense).

## III

The conspiracy instruction given by the district court did not require the jury to find that any overt act occurred in Washington, D.C., and Nwoye did not ask the district court to have the jury determine venue. In fact, Nwoye's counsel expressly agreed there was "no issue" regarding venue, and with his consent, the district court explained to the jury that venue is not a question for them and that they simply needed to find an overt act had been proven beyond a reasonable doubt. Tr. 470–71, Nov. 1, 2007. "[B]efore an appellate court can correct an error not raised at trial," there must be an

error that is plain and that affects substantial rights, and the error must "seriously affect[] the fairness, integrity, or public reputation of judicial proceedings." *Johnson v. United States*, 520 U.S. 461, 467 (1997).

Here, there was no error of any kind. Venue is a jury question only if "the defendant objects to venue prior to or at the close of the prosecution's case-in-chief," "there is a genuine issue of material fact with regard to proper venue," and "the defendant timely requests a jury instruction." *United States v. Haire*, 371 F.3d 833, 840 (D.C. Cir. 2004), *vacated on other grounds*, 543 U.S. 1109 (2005). Nwoye neither objected to venue nor requested a jury instruction, and there was no "genuine issue" regarding venue in this case. Nwoye's own testimony described at least one overt act in furtherance of the conspiracy that occurred in the District of Columbia: the incident in which Nwoye and Osuagwu lured Iweala to the Providence Hospital parking lot in Northeast D.C. to take compromising photographs. She also collected payments from Iweala at Providence Hospital on two occasions. Each incident is sufficient to establish venue in the District. *United States v. Lam Kwong-Wah*, 924 F.2d 298, 301 (D.C. Cir. 1991).

Nwoye chooses to focus on procedure, arguing that the question of venue cannot be left in the hands of the judge to be decided by a preponderance of the evidence, *e.g. United States v. Morgan*, 393 F.3d 192, 195 (D.C. Cir. 2004), but must be submitted to the jury to be decided beyond a reasonable doubt. She argues the former is inconsistent with the Sixth Amendment and with the Supreme Court's decision in *United States v. Gaudin*, 515 U.S. 506, 522–23 (1995), requiring "every element of the crime" to be decided by a jury. But the Supreme Court in *Gaudin* "did not reach the question whether venue is an element of the offense." *United*

*States v. Shepherd*, 102 F.3d 558, 565 (D.C. Cir. 1996). In fact, three justices concurred in *Gaudin* to explain that venue remained a question to be decided by the judge by a preponderance of the evidence. 515 U.S. at 525–26 (Rehnquist, C.J., O'Connor & Breyer, J.J., concurring). We have not decided the question, *Shepherd*, 102 F.3d at 565, and need not resolve it here. Absent controlling precedent on the issue or some other "absolutely clear" legal norm, the district court committed no plain error. *In re Sealed Case*, 573 F.3d 844, 851 (D.C. Cir. 2009).

## IV

The district court properly denied Nwoye's request for a duress instruction and did not plainly err in its jury instruction relating to venue. The conviction is therefore

*Affirmed.*

TATEL, *Circuit Judge*, dissenting: Born, raised, and educated in Nigeria, Queen Nwoye came to the United States only five years before the events in this case. At her trial, Nwoye took the stand and gave a harrowing account of her relationship with her boyfriend Adriane Osuagwu—testimony that we must accept as true for purposes of the issue before us. *United States v. Glover*, 153 F.3d 749, 752 (D.C. Cir. 1998). According to Nwoye, Osuagwu regularly assaulted her, "slugg[ing]" and "beating" her even "for little arguments." Trial Tr. at 371, 391, 393 (Nov. 1, 2007). He controlled her finances, used her ATM card, charged her credit cards, and told her how to spend her money. She testified that Osuagwu "was in total control," *id.* at 370, monitoring her constantly and forcing her not only to keep her phone on and answer immediately, but also to stay on the phone with him via Bluetooth headset during her nursing school classes.

When Osuagwu learned that Nwoye had had a previous affair with a married man, Ikemba Iweala, he demanded that she introduce him to Iweala. Osuagwu suspected that Iweala would be willing to pay a handsome amount to keep the affair secret. When Nwoye refused to make the introduction, Osuagwu beat her, she capitulated, and the extortion began. When she later resisted continuing with the plot, Osuagwu beat her until she was "helpless." *Id.* at 373. Each time Nwoye met with Iweala, Osuagwu either accompanied her or, as Nwoye's phone records confirm, monitored her by phone. He hit her when she failed to "do [her part] right" and threatened to "strangle" and "bury [her] right in [her] house" if the scheme was exposed. *Id.* at 374, 381. "I was so scared. I didn't know who to talk to." *Id.* at 380. She followed Osuagwu's instructions because "I was scared. I was so scared of this guy." *Id.* at 371.

Nwoye testified that Osuagwu told her that he worked for the FBI. Asked by the government why she never called the

police about the extortion or Osuagwu's threats, Nwoye explained that she thought that police "all work together for the government" and that reporting him would lead to "more trouble." *Id.* at 417. "It's not easy," she testified. "This is an FBI guy. He would find out." *Id.* at 400. When the prosecutor pointed out that law enforcement agents could be arrested if reported, Nwoye responded, "Who are you going to tell?" *Id.*

Based on this testimony, Nwoye requested a duress instruction. The district court refused, and the jury convicted her.

**\*\*\***

Duress is a classic affirmative defense. To prevail on a duress defense, a defendant must convince the jury that (1) she "acted under the threat of immediate death or serious bodily injury," *United States v. Gaviria*, 116 F.3d 1498, 1531 (D.C. Cir. 1997) (per curiam), and (2) that she "had no reasonable legal alternative to committing the crime," *id.*, i.e., no "chance both to refuse to do the criminal act and also to avoid the threatened harm," *United States v. Bailey*, 444 U.S. 394, 410 (1980) (internal quotation marks omitted). "[A] defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United States*, 485 U.S. 58, 63 (1988). To obtain a duress instruction, a defendant "need not produce strong evidence." *United States v. Jenrette*, 744 F.2d 817, 821 (D.C. Cir. 1984); *see also United States v. Riffe*, 28 F.3d 565, 570 (6th Cir. 1994) ("so long as there is even weak supporting evidence, refusal to give the instruction is reversible error" (internal quotation marks omitted)), *abrogated on other grounds by Dixon v. United States*, 548 U.S. 1 (2006). Because "in a criminal case

the law assigns [the fact-finding function] solely to the jury," *Sandstrom v. Montana*, 442 U.S. 510, 523 (1979)—and indeed because criminal defendants like Nwoye enjoy a constitutional right to trial by jury—a district court may not refuse a duress instruction unless "the evidence is insufficient as a matter of law to support a finding of duress." *Jenrette*, 744 F.2d at 821.

Given our obligation to take Nwoye's testimony as true and to view all evidence in the light most favorable to her, the record contains more than enough evidence to have warranted a duress instruction. Nwoye testified that Osuagwu repeatedly beat her and threatened to kill and bury her in her own house unless she followed through with the extortion. This threat is hardly vague or speculative. By any definition, it qualifies as "act[ing] under the threat of immediate death or serious bodily injury." *Gaviria*, 116 F.3d at 1531. This case is thus nothing like *Jenrette* where the defendant presented no specific reason to fear bodily harm except that he heard the bribe-giver was "a tough guy." 744 F.2d at 821 & n.5.

The only question, then, is whether Nwoye had a reasonable legal alternative to committing the crime. The government presents a sensible legal alternative: call the police! And the court agrees, as do I, that calling the police would have been a wise choice. But Nwoye has a response. Because she believed that Osuagwu worked for the FBI, she feared not only that anything she reported to the police would get back to him and that he would kill her, but also that—and again because she thought he was part of the FBI—the police would neither protect her nor investigate him. "This," she testified, "is an FBI guy. He would find out." "Who are you going to tell?"

To the American-born, highly educated, legally sophisticated judges of this court, Nwoye's fears are unreasonable. They fault her for "provid[ing] no evidence of corruption beyond her conclusory assertion that police and FBI 'all work together for the government' and that anything she told the authorities would find its way to Osuagwu." Maj. Op. at 9. But to obtain a duress instruction, she needed no evidence that police were *actually* corrupt or that they *actually* worked together or that they would *actually* tell Osuagwu that she reported him. She needed only a reasonable belief that the police would refuse to protect her, and reasonableness is quintessentially a question for the jury. *United States v. Gaudin*, 515 U.S. 506, 512 (1995) ("[D]elicate assessments of the inferences a reasonable decisionmaker would draw from a given set of facts and the significance of those inferences to him is peculiarly one for the trier of fact." (alterations, omission, and internal quotation marks omitted)); *see also United States v. Duncan*, 850 F.2d 1104, 1117 (6th Cir. 1988) (The test for sufficiency to reach a jury "[c]ertainly . . . cannot be one of reasonableness. It is not for the judge, but rather for the jury, to appraise the reasonableness or the unreasonableness of the evidence . . . . To hold otherwise would be tantamount to a grant of partial summary judgment to the Government in a criminal case." (internal quotation marks omitted)). And a jury of Nwoye's peers, reflecting "the commonsense judgment of a group of laymen," *Williams v. Florida*, 399 U.S. 78, 100 (1970), might well view the record very differently than do the judges of this court. The jury, observing the testimony of an abused woman and recent immigrant subject to the brutal control of a man she believed was part of American law enforcement and forced by him to participate in an unlawful conspiracy, might well believe her and conclude that she actually thought—and given her situation, reasonably thought—that any attempt to

call the authorities would end in her ruin. *See McCleskey v. Kemp*, 481 U.S. 279, 311 (1987) ("[J]urors bring to their deliberations qualities of human nature and varieties of human experience, the range of which is unknown and perhaps unknowable." (internal quotation marks omitted)); *Taylor v. Louisiana*, 419 U.S. 522, 532 n.12 (1975) (the jury's "perspective on human events . . . may have unsuspected importance" to a defendant); *see also* Oral History: Judge William B. Bryant (1911–2005) at 146, *available at* http://www.dcchs.org/WilliamBBryant/WilliamBBryant_com plete.pdf ("I've known judges who would be completely horrified and think you were out of your mind if you indicated that you thought from time to time a policeman wasn't telling the truth. And they couldn't understand why anybody would disbelieve a policeman. A lot of jurors know better. They have been around, and they have seen what happens in the streets and some of them have been exposed to some things . . . .").

None of the cases the court cites support taking the question of reasonableness from the jury. In *Jenrette*, the defendant testified that he was under duress to accept a bribe because the two bribe-givers "deliberately portrayed themselves as mobsters" and that "because he suffers from paranoia induced by alcoholism, this 'gangster image' induced a reasonable fear of imminent danger." 744 F.2d at 821. Instead of dismissing this belief—as this court dismisses Nwoye's—we assumed its reasonableness. *See id.* ("Assuming that Jenrette reasonably believed Weinberg and Amoroso were gangsters and that this belief produced a reasonable fear . . . ."). Even so, we rejected the duress instruction because the defendant—unlike Nwoye—"ha[d] offered no explanation for his failure to take alternative action, such as notifying law enforcement officials." *Id.* In

*Gaviria*, we rejected a duress instruction because although the defendant claimed that prison officials were corrupt, he offered no explanation for failing to go to others despite "ample opportunities" to do so in unmonitored meetings or conversations. 116 F.3d at 1531. In sharp contrast, Nwoye offered a specific explanation for why she thought contacting authorities herself or having an acquaintance do so would be of no help. The record, moreover, provides no support for the claim that there were "relatives, classmates, and teachers with whom she could seek refuge." Maj. Op. at 10.

Nor do the two out-of-circuit cases the court cites support its position. Both lack the evidence lying at the very heart of this case: testimony that contacting the authorities would provoke, rather than prevent, the threatened act. *See United States v. Alicea*, 837 F.2d 103, 105–06, 107 (2d Cir. 1988) (explaining that, unlike the defendant in a Ninth Circuit case who believed authorities worked with the threateners, these defendants "presented no such special circumstances," and detailing defendants' opportunities to safely contact various authorities); *R.I. Recreation Ctr., Inc. v. Aetna Cas. & Sur. Co.*, 177 F.2d 603, 604–06 (1st Cir. 1949) (denying defense of coercion in a *civil* insurance suit where plaintiff contended its manager acted under gangsters' threats, but never stated that contacting the police would be dangerous or ineffective, and manager had "ample" opportunities to call the police while "walking over a mile to his rendezvous with the bandits"). This also explains why a jury, if given a chance to consider the question, could conclude that Nwoye's "fail[ure] to take any advantage of Osuagwu's" trip to California was, under the circumstances, perfectly understandable. Maj. Op. at 7. True, Nwoye had time to call the police in Osuagwu's absence. But because she feared that the police would not protect her and that Osuagwu would learn of any contact with

the authorities, the beatings—and perhaps even her murder—were inevitable if she did call the police.

Finally, our sister circuits have required duress instructions in circumstances similar to Nwoye's. In *United States v. Contento-Pachon*, the Ninth Circuit held that the defendant, who testified that he believed police in Colombia served as paid informants for drug traffickers, was entitled to a duress instruction because although he had time to contact these authorities or to flee with his wife and three-year-old child, "[a] juror might find that this was not a reasonable avenue of escape." 723 F.2d 691, 694 (9th Cir. 1984). In *United States v. Riffe*, the defendant, a prisoner threatened by a prison gang, feared going to prison officials because they might not keep his statements secret and protective custody might fail to keep the gang at bay. 28 F.3d at 568. The Sixth Circuit held that the defendant was entitled to a duress instruction because a jury, not the court, should assess whether he "had nowhere to turn in the prison for safe haven." *Id.* at 570.

***

Nwoye's claim is simple and fundamental to the criminal process. She asks that her defense of duress be heard by a jury of her peers. To be sure, had the district court given a duress instruction, the jury might have disbelieved her or found her fears to be unreasonable. But it is the jury's job to make that decision, not this court's to decide how it would vote in a juror's place. I dissent.