# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 11, 2014      Decided December 2, 2014

No. 13-3034

UNITED STATES OF AMERICA,
APPELLEE

v.

MAURICE WILLIAMS,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:12-cr-00022-2)

———

*Gregory S. Smith*, appointed by the court, argued the cause
and filed the briefs for appellant.

*Nicholas P. Coleman*, Assistant U.S. Attorney, argued the
cause for appellee. With him on the brief were *Ronald C.
Machen Jr.*, U.S. Attorney, and *Elizabeth Trosman* and *John P.
Mannarino*, Assistant U.S. Attorneys.

Before: GARLAND, *Chief Judge*, PILLARD, *Circuit Judge*,
and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Chief Judge* GARLAND.

GARLAND, *Chief Judge*: A jury convicted Maurice Williams on four counts related to his role in a conspiracy to distribute narcotics. On appeal, Williams challenges the constitutionality of searches that uncovered the drug evidence the government used against him at trial, the propriety of part of the prosecutor's closing argument, and the district court's refusal to accept an argument Williams advanced at sentencing. For the reasons set forth below, we affirm the judgment of the district court.

I

In September 2011, the Metropolitan Police Department (MPD) began an investigation of suspected narcotics activity in a house on Ninth Street, N.W. in Washington, D.C. On September 16, an undercover officer saw three different individuals approach a man -- later identified as appellant Maurice Williams' brother -- sitting on the house's front porch. Each individual engaged in brief conversation with the man, went into the house with him for about a minute, and then left. Officer Kenneth Thompkins and other MPD officers stopped each of the three individuals: two possessed cocaine; the third swallowed what the officers suspected were narcotics before they were able to reach him.

On October 21, Officer Thompkins and his partner were watching the Ninth Street house from their unmarked police car when they saw appellant Williams leave the house. According to Thompkins' subsequent testimony, Williams then got into a white Chevrolet parked nearby and drove off without putting on his seatbelt. Suspecting that Williams was another drug customer, Thompkins and his partner followed in their car, intending to conduct a traffic stop. Repeatedly looking in his rearview mirror, Williams stayed in the right lane and paused behind a double-parked car on Georgia Avenue to let the officers pass. The officers drove past in the left lane and,

according to Thompkins' testimony, he saw that Williams still had not put on his seatbelt.  They then pulled over to the side and waited until Williams began driving again.  When he passed them, the officers stopped the Chevrolet.

As the officers approached Williams' car, Officer Thompkins saw Williams watch them in his rearview mirror, twice remove items from his jacket, and put the items in the car's center console.  Thompkins, who smelled a "strong scent of fresh marijuana" coming from the car, Suppression Hr'g Tr. 15, asked Williams for his driver's license and registration.  Williams said he did not have his license with him and did not have the registration because the car was rented.  Thompkins made an inquiry with MPD and learned that Williams' license had expired.  After arresting Williams for driving without a permit, Thompkins searched the center console, where he found four grams of fresh marijuana and 125 grams of powder cocaine.

Armed with this evidence, the police obtained a search warrant and searched the Ninth Street house the same day.  There they found crack cocaine, additional powder cocaine, drug paraphernalia, and a recent letter addressed to Williams at that address.  Eventually, prosecutors filed drug charges against Williams and his brother.  As Williams was no longer in custody on the driving-without-a-permit charge, prosecutors obtained bench warrants for the arrests of both men.

On February 1, 2012, Thompkins arrested Williams' brother.  Thompkins then called Williams' cell phone, told Williams of his brother's arrest, and -- as a ruse -- asked Williams to come to the police station to pick up his brother's property. Williams was arrested when he arrived at the station. In a search incident to that arrest, the police found, among other things, a set of car keys on Williams' person.

At some point that evening, Officer Thompkins asked Williams how he got to the police station; Williams responded that he had been dropped off. Later, Thompkins pressed a button on the key fob attached to the car keys, which caused the lights on a blue sedan parked outside the police station to flash. When he approached the car, Thompkins again smelled a strong odor of fresh marijuana through a partially open car window. Thompkins called for a drug-sniffing dog, which "hit" on the vehicle, indicating that narcotics were inside. Officers opened the driver's side door and saw a clear, plastic-wrapped package of crack cocaine on the inside handle. They also found 21.9 grams of marijuana inside the center console and paperwork with Williams' name on it under the sun visor. In a videotaped interview later that evening, Williams told an officer that he had obtained the crack from "some guy that he had just met from southeast" and that it was worth $3500. 2 Trial Tr. 217.

On January 26, 2012, a grand jury indicted Williams on four counts: (1) conspiracy to distribute and possess with intent to distribute marijuana, crack cocaine, and powder cocaine, in violation of 21 U.S.C. § 846; (2) possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C); (3) possession with intent to distribute 28 grams or more of crack cocaine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(iii); and (4) simple possession of marijuana, in violation of 21 U.S.C. § 844(a). All of the counts were based on the evidence obtained during the October 21, 2011 searches of the white Chevrolet and Ninth Street house. The drugs seized from the blue sedan on February 1, 2012 were admitted only as "other acts" evidence under Federal Rule of Evidence 404(b).

Williams moved to suppress the evidence the police seized on October 21, 2011 and February 1, 2012. The district court denied the motion, and a jury convicted Williams on all counts.

On April 11, 2013, the court sentenced Williams to 63 months' imprisonment.

On appeal, Williams argues that the district court should have suppressed the evidence the police seized on both days because the seizures violated the Fourth Amendment, that the prosecutor improperly vouched for the credibility of police witnesses during closing argument at trial, and that the court erred in refusing to consider sentencing disparities between federal and District of Columbia sentencing guidelines as a ground for a downward sentencing variance under 18 U.S.C. § 3553(a)(6). We address these arguments below.

II

Williams' first contention is that the district court erred in denying his motion to suppress the drug evidence arising out of the October 21 car stop. As noted above, Officer Thompkins testified he twice saw that Williams was driving without a buckled seatbelt in violation of a District of Columbia ordinance: when Williams first drove away from the Ninth Street house, and when Thompkins' car passed Williams' on Georgia Avenue. For his part, Williams testified he was wearing his seatbelt from the get-go. He was wearing it, he said, because a seatbelt had saved his life in a serious car accident the year before. From then on, he explained, he always buckled up.

The district court concluded that Williams' testimony was credible. *United States v. Williams*, 878 F. Supp. 2d 190, 201 (D.D.C. 2012). From this, Williams deduces that the court found he was in fact wearing a seatbelt. As a consequence, he maintains that Thompkins could not have had probable cause to stop him for not wearing one, and that Thompkins therefore violated the Fourth Amendment by doing so. In addition, Williams argues that, because the items of evidence seized in the

subsequent car search were the proceeds of the unlawful stop, the court should have excluded them from the trial. He further contends that the court should have suppressed the evidence seized from the Ninth Street house as well, because the warrant that justified that search and seizure was premised on the evidence Thompkins obtained from the search of the car.

Williams does not dispute that an officer may constitutionally stop an automobile if he has probable cause to believe that the driver has committed a motor vehicle violation. *See Whren v. United States*, 517 U.S. 806, 819 (1996). Nor does he dispute that, if the stop of the car was lawful, the search of the car was justified by the officers' subsequent observation of Williams twice taking things from his jacket and putting them in the center console, combined with the strong smell of marijuana coming from the car. *See United States v. Jackson*, 167 F. App'x 812, 813 (D.C. Cir. 2005) (holding that "the smell of burnt marijuana emanating from the vehicle provided probable cause to justify the agents' search of the vehicle"); *see also United States v. Washington*, 670 F.3d 1321, 1323 (D.C. Cir. 2012). He maintains, however, that the district court's finding that Thompkins had probable cause to stop the white Chevrolet cannot be squared with the court's acceptance of Williams' testimony that he was wearing his seatbelt all along.

But the circle is readily squared in the way the district court squared it. It is true that the court found that Williams credibly testified that he buckled his seatbelt. The court also found, however, that Thompkins credibly testified that he saw what he thought was an unbuckled seatbelt. In short, it "found them both to be credible." *Williams*, 878 F. Supp. 2d at 202. Moreover, the court further found that, "even if Maurice Williams were wearing his seatbelt, . . . Thompkins was objectively reasonable in his belief that the defendant committed a traffic violation by driving without a seatbelt." *Id.* Thompkins' belief was

"objectively reasonable," the court said, in light of his credible testimony that "he had a clear view, could see through the tinted window of defendant Maurice Williams' vehicle because it was a sunny day, and [had an] opportunity to confirm his belief that the defendant was not wearing a seatbelt when the defendant was stopped at the side of Georgia Avenue." *Id.*[1]

In so holding, the district court followed this circuit's decision in *United States v. Hill*, 131 F.3d 1056 (D.C. Cir. 1997). In that case, the police had stopped the defendant's car for allegedly failing to display a Vehicle Identification Number ("VIN number") on his temporary tags. The defendant testified that the tags had a VIN number on the night of the arrest. An officer testified that they did not. As was the case here, although the district court could not "say whether the tags had a VIN number on them or not," it credited the officer as truthfully testifying "that he believed that the car did not have a VIN number." *Id.* at 1060.

In *Hill*, we reversed the district court's denial of the defendant's suppression motion and remanded "for a determination of whether it was objectively reasonable for the officer that observed Hill's car to conclude that a traffic violation had occurred." 131 F.3d at 1060. Probable cause required, we said, that the officer's conclusion be "objectively reasonable," *id.* at 1061 n.3; *see Hill v. California*, 401 U.S. 797, 802, 804 (1971), and the district court had "never explicitly stated whether or not this belief was objectively reasonable,"

---

[1]At oral argument, Williams' counsel stated that he did not challenge as clearly erroneous the district court's factual findings regarding what the officer had perceived. Oral Arg. Recording 6:27-7:05; *see United States v. Holmes*, 505 F.3d 1288, 1292 (D.C. Cir. 2007) (noting that an appellate court reviews a district court's "factual findings" on a suppression motion "for clear error").

8

*Hill*, 131 F.3d at 1060. In particular, we noted that "the record before us contain[ed] no information regarding the conditions under which the officer first observed Hill's car -- e.g., how far away the police cruiser was from Hill's car at the time the officer first observed the tags, the quality of the lighting, how quickly Hill's car was moving, etc." *Id.*

Here, by contrast, the district court took care both to expressly state that it found the officer's belief objectively reasonable, and to make the factual findings necessary to establish that the officer was able to make his observations under conditions that rendered his belief reasonable. *See Williams*, 875 F. Supp. 2d at 202. As we said in *Hill*, "[i]t was not necessary for the court to determine whether or not a VIN actually appeared on Hill's temporary tags at the time of the traffic stop. Even if the court assumed that, contrary to the testimony of the police officer, the tags contained a VIN at the time of the stop, the stop was still permissible as long as the officer's belief that the VIN was missing was objectively reasonable." 131 F.3d at 1061 n.3. In support, we cited controlling precedent holding that an officer's reasonable mistake of fact can provide probable cause for a stop.[2] Because

[2] *See Hill v. California*, 401 U.S. at 802 ("[W]hen the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest." (internal quotation marks omitted)); *United States v. Glover*, 725 F.2d 120, 122 (D.C. Cir. 1984) (same); *see also Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990) (holding that there is no constitutional violation "when officers enter without a warrant because they reasonably (though erroneously) believe that the person who has consented to their entry is a resident of the premises"). Williams maintains that the "reasonable mistake of fact" line of cases should be limited to mistakes made by someone other than the arresting officer, and should not excuse mistakes in the officer's own observations. Williams Br. 23-25; Reply Br. 6. All of the cases cited in this

Officer Thompkins' belief that the seatbelt was unbuckled was reasonable, whether or not it was erroneous, he had the probable cause necessary to conduct the October 21 stop.

## III

Williams' second challenge concerns the district court's refusal to suppress the drug evidence that the police recovered during the February 1 search of his blue sedan outside the police station. According to Williams, when Officer Thompkins activated Williams' key fob, Thompkins conducted a search within the meaning of the Fourth Amendment. That search, Williams argues, was neither supported by probable cause nor authorized by a warrant (nor subject to an exception to the warrant requirement) and was therefore unconstitutional. Williams further contends that the subsequent search and seizure of drugs from his car constituted a separate Fourth Amendment violation, as it was also undertaken without a warrant.

1. There is no dispute that the officers' search of Williams' person and their seizure of the keys and key fob were lawful as part of a search incident to his arrest. *See United States v. Robinson*, 414 U.S. 218, 235 (1973); *United States v. Riley*, 351 F.3d 1265, 1269 (D.C. Cir. 2003); *cf. Riley v. California*, 134 S. Ct. 2473, 2484 (2014) (reaffirming *Robinson*'s categorical rule with respect to the search and seizure of a physical object). Whatever the merits of Williams' claim that the warrantless activation of his key fob constituted a separate, unlawful search, we do not reach them here. At the suppression hearing, Williams did not claim that the activation of the key fob constituted a search at all, let alone an unconstitutional search. *See* Mem. in Supp. of Def.'s Mot. to Suppress at 2-3. Accordingly, pursuant to Federal Rule of Criminal Procedure

footnote, however, involved mistakes made by officers themselves.

12, Williams' claim is waived.  *See* FED. R. CRIM. P. 12(b)(3)(C), (e); *United States v. Peyton*, 745 F.3d 546, 551 (D.C. Cir. 2014); *United States v. Mitchell*, 951 F.2d 1291, 1296-97 (D.C. Cir. 1991).[3]

Even if we were to treat Williams' failure to raise this claim as a forfeiture rather than waiver, we would still not be able to adjudicate its merits de novo.  We may review an argument that a defendant forfeits by failing to raise it in district court only for plain error.  *United States v. Simpson*, 430 F.3d 1177, 1183 (D.C. Cir. 2005).  Under that standard:  "'[T]here must be (1) error, (2) that is plain, and (3) that affect[s] substantial rights.  If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'"  *Id.* (quoting *Johnson v. United States*, 520 U.S. 461, 467 (1997) (internal citations and quotation marks omitted)); *see* FED. R. CRIM. P. 52(b).  In most cases, to affect the defendant's substantial rights, "'the error must have been prejudicial:  It must have affected the outcome of the district court proceedings.'"  *Simpson*, 430 F.3d at 1184 (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)).

If there were an error here, it would still falter at the second requirement.  As we have explained, "[a]bsent controlling precedent on the issue or some other 'absolutely clear' legal norm, the district court commit[s] no plain error."  *United States v. Nwoye*, 663 F.3d 460, 466 (D.C. Cir. 2011) (quoting *In re Sealed Case*, 573 F.3d 844, 851 (D.C. Cir. 2009)).  There is no controlling precedent or clear legal norm regarding the activation of key fobs.  Neither this circuit nor any other has

---

[3]Although a court may grant relief from waiver "[f]or good cause," FED. R. CRIM. P. 12(e), Williams makes no argument for such relief.

held that an officer's warrantless activation of a key fob to locate the vehicle to which it corresponds constitutes a search, let alone an unconstitutional one. *Cf. United States v. Cowan*, 674 F.3d 947, 955-57 (8th Cir. 2012) (holding that the use of a key fob to locate a car is *not* a search or seizure because, inter alia, "the fob merely would identify the vehicle" and the defendant "did not have a reasonable expectation of privacy in the identity of his car"). Accordingly, the district court did not commit plain error -- if it committed error at all -- by failing to rule that the manipulation of the key fob constituted an unlawful search.

2. Williams' challenge to the subsequent, warrantless search of his car fares no better. Williams does not dispute that, "once [the officers] smelled the marijuana and got the service dog there they had probable cause." Suppression Hr'g Tr. 117 (acknowledgment by defense counsel); *see Florida v. Harris*, 133 S. Ct. 1050 (2013) (holding that a drug-sniffing dog's detection of drugs constitutes probable cause absent a showing of the dog's unreliability); *see also Jackson*, 167 F. App'x at 813. And under the "automobile exception" to the warrant requirement, "'[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits the police to search the vehicle without more.'" *United States v. Maynard*, 615 F.3d 544, 567 (D.C. Cir. 2010) (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996)), *aff'd on other grounds sub nom. United States v. Jones*, 132 S. Ct. 945 (2012).

Williams *does* dispute that his car was "readily mobile," noting that it was parked and inaccessible to him. But all that is required for an automobile to be "readily mobile" within the meaning of the automobile exception is that it is "used on the highways, or . . . is readily capable of such use." *California v. Carney*, 471 U.S. 386, 392-93 (1985); *see Michigan v. Thomas*,

458 U.S. 259, 261 (1982) (holding that "the justification to conduct such a warrantless search does not . . . depend upon a reviewing court's assessment of the likelihood in each particular case that the car would have been driven away"). Williams' car, which he had driven to the police station and parked outside, was clearly subject to the exception.[4] The police could therefore search it without a warrant if they had probable cause to do so -- which they did.

## IV

Williams next argues that the prosecutor's closing argument "improperly vouched for the credibility of [the government's] law enforcement witnesses." Williams Br. 46. In his closing argument to the jury, Williams' attorney challenged Officer Thompkins' account of his stop of the white Chevrolet, maintaining that Thompkins "ma[d]e up the statement that [he] saw [Williams] get in the car without putting on a seat belt," 4 Trial Tr. 66, and declaring that Thompkins' testimony "defie[d] common sense," *id.* at 65, and "lack[ed] any credibility," *id.* at 66. Williams also attacked the credibility of other police witnesses who had testified during the trial. *Id*. at 69-70. During her rebuttal, the prosecutor attempted to rehabilitate the officers' credibility by noting that: (1) "there is absolutely no evidence here that these officers all somehow came together to railroad Maurice Williams," *id.* at 76; and (2) there is "no indication at all that any of the officers involved in this case

---

[4]*See United States v. Johns*, 469 U.S. 478, 484 (1985) (holding that a "vehicle lawfully in police custody may be searched on the basis of probable cause to believe that it contains contraband"); *Michigan*, 458 U.S. at 260 (affirming the warrantless search of an automobile, in which officer had probable cause to believe there was contraband, notwithstanding that "both the car and its occupants were already in police custody").

have ever met these defendants, that there's any personal vendetta against them," *id.* at 79. The prosecutor then rhetorically asked, (3) "why would these officers jeopardize lengthy careers and lie about individuals they don't know?" *Id.* at 80.

Williams did not object to any of the prosecutor's statements. As he acknowledges, we therefore may review them only for plain error. Williams Br. 47 n.20; *see United States v. Young*, 470 U.S. 1, 14 (1985) (holding that "the dispositive issue . . . is not whether the prosecutor's [unobjected-to] remarks amounted to error, but whether they rose to the level of 'plain error'" under Federal Rule of Criminal Procedure 52(b)); *see also United States v. Wilson*, 605 F.3d 985, 1022 (D.C. Cir. 2010); *United States v. Boyd*, 54 F.3d 868, 872 (D.C. Cir. 1995). As we noted above, this means that we may reverse the conviction only if: there was error; the error was plain; the error was prejudicial; and the error seriously affected the fairness, integrity, and public reputation of judicial proceedings. *Simpson*, 430 F.3d at 1183.

This circuit has repeatedly held that it is error for a prosecutor to "vouch" for the credibility of a witness, whether based on evidence outside the trial record or on the prosecutor's word (which is itself presumably based on evidence outside the record). *See, e.g.*, *United States v. Moore*, 651 F.3d 30, 62 (D.C. Cir. 2011); *Wilson*, 605 F.3d at 1021-22; *United States v. Brown*, 508 F.3d 1066, 1074-75 (D.C. Cir. 2007); *Boyd*, 54 F.3d at 871-72. Neither of the first two comments identified above fit that description. Neither relied on the prosecutor's word or on evidence outside the record. To the contrary, each called the jury's attention to the trial record, noting the *absence* of the kind of evidence that might support defense counsel's claim that the officers were lying about what they saw.

The prosecutor's third comment -- asking why the officers "would . . . jeopardize lengthy careers and lie about individuals they don't know" -- is a different matter. Indeed, it is virtually identical to the prosecutor's comment that we held was error in *United States v. Boyd*. *See* 54 F.3d at 870 ("Does it make sense that they are going to get on the stand and perjure themselves to get Jannazzo Boyd? Does it make sense that they are going to put their careers . . . on the line for Jannazzo Boyd, someone that they don't even know . . . ?"). In *Boyd*, we found the comment to be "clearly improper" because it constituted "'vouching' for the police witnesses' credibility," based "on evidence not in the record" regarding the effect the testimony might have on the witnesses' careers. *Id*. at 871. We have repeated *Boyd*'s holding at least twice. *See United States v. Reed*, 522 F.3d 354, 360 & n.6 (D.C. Cir. 2008); *United States v. Hall*, 370 F.3d 1204, 1209 (D.C. Cir. 2004). Accordingly, the prosecutor's error was not just error; it was also plain.

It is no answer to argue, as the government does, that the prosecutor's statement was justified by the defense counsel's attacks on the police witnesses' credibility during his own closing argument. *See Young*, 470 U.S. at 14 (holding that a prosecutor's statement in rebuttal argument constituted error, notwithstanding that it was a response to an improper argument by defense counsel). Indeed, the D.C. Circuit case that the government cites for this proposition, *United States v. Hall*, does not support it. *See* 370 F.3d at 1209 n.5 ("We do not mean to say that the . . . prosecutor's reply . . . was proper."). Moreover, the prosecutor's justification in this case was even weaker than it was in *Hall*. In *Hall*, the prosecutor was responding directly to defense counsel's suggestion "that the officers' desire not to jeopardize their careers gave them a motive to commit perjury." 370 F.3d at 1209. Here, defense counsel had said nothing about the officers' career interests, arguing only that the testimony

must have been "made up" because it defied "common sense." 4 Trial Tr. 65-66.

Nonetheless, as in *Boyd* (and *Hall*), although the prosecutor's statement was error, it did not constitute prejudicial error. *See Boyd*, 54 F.3d at 872; *see also Hall*, 370 F.3d at 1209. Rather, it was an isolated remark of little import, the impact of which the district court mitigated by giving appropriate jury instructions. The court instructed the jurors that the "statements and arguments" and "questions of the lawyers are not evidence," 4 Trial Tr. 86, 89; that they "alone determine whether to believe any witnesses," *id.* at 94; and that a "police officer's testimony should be evaluated . . . just as any other evidence in the case" and should not be given "either greater or lesser weight" merely because the witness is a police officer, *id.* at 96. Under these circumstances, we conclude that the appellant did not suffer prejudice from the prosecutor's improper statement and that therefore there was no plain error. *See Boyd*, 54 F.3d at 872; *Moore*, 651 F.3d at 62-63.

V

Finally, we address Williams' challenge to his sentence. In *United States v. Booker*, the Supreme Court held that the United States Sentencing Guidelines are no longer binding on district courts, but rather are advisory only. 543 U.S. 220, 245 (2005); *see Peugh v. United States*, 133 S. Ct. 2072, 2079-80 (2013). After *Booker*, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). But the court must then consider the arguments of the parties and the seven sentencing factors set forth in 18 U.S.C. § 3553(a) to determine the appropriate sentence, including whether a variance from the advisory Guidelines range is warranted. *Id.* at 49-50; *see Peugh*, 133 S. Ct. at 2083; *Kimbrough v. United*

*States*, 552 U.S. 85, 109-10 (2007); *see also Pepper v. United States*, 131 S. Ct. 1229, 1245 n.12 (2011) (explaining that "a 'variance' refers to a non-Guidelines sentence outside the Guidelines framework"). Following this regime, the district court first calculated Williams' Guidelines range as 63-78 months' imprisonment. Thereafter, the court considered the § 3553(a) factors and rejected Williams' request for a three-month downward variance from the Guidelines range.

On appeal, Williams objects only to the district court's refusal to grant a downward variance based upon an argument he made regarding § 3553(a)(6), which directs the court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6). The sentence disparities upon which Williams relied were those between defendants tried in federal district court and sentenced under the U.S. Sentencing Guidelines, and those tried in the Superior Court of the District of Columbia and sentenced under the District's own guidelines. Williams maintained that his sentence under the latter would have been lower, and that a variance was therefore justified.

The district court rejected Williams' requested variance, concluding that the only provision upon which he had based that request, § 3553(a)(6), addresses unwarranted disparities only at the federal level, rather than disparities between federal and state sentences. The only question that Williams raises on appeal is whether the district court's construction of § 3553(a)(6) constitutes legal error. *See* Reply Br. 24. Because the district court construed that statutory provision the same way this circuit

17

did in *United States v. Washington*, the answer must be no. *See* 670 F.3d at 1326-27.[5]

Although *Washington* held that sentence disparities between the U.S. and D.C. guidelines are insufficient to support a variance under § 3553(a)(6), *id.* at 1326-27, it further held that "post-*Booker* nothing necessarily precludes consideration of the D.C. Guidelines in the district court's exercise of discretion in determining a particular sentence," *id.* at 1327. Contrary to a suggestion in Williams' post-argument letter, in this case the district court made clear it understood that, post-*Booker*, the U.S. Sentencing Guidelines are advisory only. *See* Sentencing Hr'g Tr. 13-24, 32, 46-47. But Williams offered no argument that the D.C. Guidelines were relevant to his request for a variance in any way other than under § 3553(a)(6). Def.'s Sentencing Mem. at 22-23; *see* Williams Br. 50-52. And *Washington* precludes his contention that the court misconstrued that provision.

---

[5]*See also, e.g.*, *United States v. Begin*, 696 F.3d 405, 412 (3d Cir. 2012) ("'Section 3553(a)(6) addresses unwarranted sentence disparities among federal defendants who are similarly situated instead of disparate federal and state sentences.'" (quoting *United States v. Docampo*, 573 F.3d 1091, 1102 (11th Cir. 2009))); *United States v. Jeremiah*, 446 F.3d 805, 807-08 (8th Cir. 2006) ("Unwarranted sentencing disparities among federal defendants remains the only consideration under § 3553(a)(6) -- both before and after *Booker*."); *United States v. Clark*, 434 F.3d 684, 687 (4th Cir. 2006) ("The sole concern of section 3553(a)(6) is with sentencing disparities among federal defendants." (emphasis omitted)).

18

VI

For the foregoing reasons, the judgment of the district court is

*Affirmed.*