# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued January 23, 2017        Decided August 18, 2017

No. 15-3045

UNITED STATES OF AMERICA,
APPELLEE

v.

BRIANNA MEADOWS,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:14-cr-00073-1)

*Charles B. Wayne*, appointed by the court, argued the cause for appellant. With him on the briefs was *Jerald R. Hess*, appointed by the court.

*Katherine M. Kelly*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Elizabeth Trosman* and *Suzanne G. Curt*, Assistant U.S. Attorneys.

Before: GARLAND, *Chief Judge*, ROGERS, *Circuit Judge*, and WILLIAMS, *Senior Circuit Judge*.

2

Opinion for the Court filed by *Chief Judge* GARLAND.

Opinion concurring in part and concurring in the judgment filed by *Circuit Judge* ROGERS.

GARLAND, *Chief Judge*:  Brianna Meadows was convicted of fraudulently obtaining unemployment benefits from the District of Columbia Department of Employment Services.  On appeal, she contends that the district court erred in denying her pre-trial motion to dismiss the indictment for prosecutorial vindictiveness, and in permitting the government to make improper statements at trial.  For the reasons set forth below, we affirm the judgment of the district court.

I

In January 2008, Brianna Meadows lost her job.  On April 27, 2009, with the assistance of a staffing agency, Meadows began working in a temporary, full-time position as an administrative assistant at the U.S. Food and Drug Administration (FDA).  She held that position until September 2010.  Although Meadows was working full time, she submitted unemployment benefits claims to the Department of Employment Services by computer, sometimes from her workspace at the FDA.

The Department establishes a claimant's eligibility to receive unemployment benefits through a six-question weekly claim form, which claimants may submit online.  As relevant here, the second question on the form requires claimants to certify whether they worked during the week claimed and, if so, to report their earnings.  While performing work does not necessarily disqualify a claimant from receiving unemployment benefits altogether, a claimant whose salary exceeds a certain threshold is ineligible.  In this case, Meadows' weekly salary of

$692.68 disqualified her from receiving unemployment benefits. Nonetheless, based on the information she submitted to the Department between April 2009 and May 2010, Meadows received a total of $14,173 in benefits.

In February 2011, following an audit, the Department notified Meadows that it had uncovered overpayments that may have stemmed from her failure to accurately report her earnings. In March, the Department mailed Meadows a formal notice of its determination that she had received overpayments. Although the notice made clear that criminal sanctions could result from a failure to repay, Meadows did not make any voluntary repayments to the Department between March 2011 and August 2014 (except for a possible attempted payment of $150).

The foregoing conduct came to the attention of the United States Attorney for the District of Columbia as a result of a separate investigation called "Concrete Playground" that began in March 2011. That investigation targeted corrections officers who were smuggling contraband to prisoners in the D.C. Jail. The government alleged that Meadows herself brought contraband to Pedro Petrovic, an inmate and her boyfriend at the time, who had been convicted of first-degree murder and other charges. In the investigation leading up to Petrovic's conviction, Meadows had been indicted on charges of obstruction of justice and accessory after the fact, but those charges were eventually dropped. In the jail contraband investigation, agents obtained evidence that Meadows gained access to the D.C. Jail by posing as an employee of the Public Defender Service. That led them to make further inquiries about her, and they then discovered what they believed to be her scheme to defraud the Department of Employment Services by unlawfully claiming unemployment benefits.

Meadows declined to speak with investigators about the jail contraband case. Continuing to seek her cooperation, in June 2012 the U.S. Attorney's Office served her with both a grand jury subpoena and a target letter. The following year, the government extended two plea offers to Meadows that combined unemployment benefits fraud charges with charges stemming from her alleged participation in the jail contraband scheme. Neither was conditioned on cooperation in the prosecution of anyone else. The first plea offer included one felony and one misdemeanor charge. The second offered one count of misdemeanor fraud for the unemployment benefits fraud scheme and another misdemeanor count for providing contraband in prison. Meadows rejected both offers.

On March 27, 2014, a grand jury indicted Meadows on six felony counts: four counts of wire fraud, in violation of 18 U.S.C. § 1343; one count of theft of federal government property, in violation of 18 U.S.C. § 641; and one count of first-degree theft, in violation of D.C. Code §§ 22-3211, 22-3212(a). Before trial, Meadows filed separate motions to dismiss the federal theft count (Count 5) on the ground that the funds at issue were not federal, and to dismiss the indictment as a whole on the ground that she was being prosecuted vindictively. The district court denied the motion to dismiss Count 5 on August 12, 2014. Six days later, Meadows made her first (material) voluntary repayment to the Department of Employment Services, in the amount of $500. On September 23, the court denied the motion to dismiss the indictment for prosecutorial vindictiveness. Thereafter, as the trial approached, Meadows made two more repayments: $1,500 in October and $5,953 in November 2014. By the time the trial began on December 17, 2014, the government had recouped the full $14,173, as it had already recouped the rest by withholding Meadows' tax refunds.

At trial, the prosecution's theory was that Meadows knowingly filed false unemployment claim forms online with the Department of Employment Services and received $14,173 in unwarranted payments while working full time. The government presented documentary evidence, including Meadows' timesheets from her job at FDA, print-outs of the weekly claim forms she submitted to the Department, and bank records detailing the benefits she received. It also called seven witnesses.

The defense evidence consisted primarily of Meadows' testimony. She acknowledged that, during the relevant period, she worked full time in a temporary position at the FDA and earned full-time wages. She further acknowledged that she began filing weekly unemployment claims online the same week she started her full-time job at FDA. Meadows testified that, at the time she applied for and received unemployment benefits, she believed she could work full time and earn full-time wages, yet still submit claims for unemployment benefits. Meadows said she thought she was eligible to do so because she was working in a temporary position at FDA and was therefore still actively seeking a permanent, full-time job. That, she said, explained why she answered "no" to a question on the weekly Department of Employment Services claim form that asked: "Did you return to work full-time?" Trial Tr. 89-91 (Dec. 18, 2014).

On cross-examination, Meadows acknowledged that she applied for and received $14,173 in unemployment benefits. She was also asked about Question 2 on each weekly claim form, which stated: "Did you perform work during the week claimed? If yes, indicate gross earnings amount in box at right." Meadows said she answered "Yes" to that question and entered the wages that she earned on each of the 49 weekly forms she submitted to the Department. *Id.* at 90, 107. She was then

presented with documentary evidence showing that none of the 49 forms contained those answers in response to Question 2. Meadows' response was that a computer glitch must have caused the same errors to appear on each of the 49 separate forms she submitted online.

On December 22, 2014, a jury found Meadows guilty on all six counts. At the subsequent sentencing hearing, the district court found that Meadows had perjured herself with respect to the purported computer "glitch," willfully giving "false testimony concerning her completion of the 49 claim forms in this case." Sentencing Tr. 14 (July 16, 2015). As a consequence, the court increased Meadows' U.S. Sentencing Guidelines level by two and sentenced her to 36 months of probation, with the condition that she serve 120 days in jail on weekends. *Id.*

On appeal, Meadows raises claims of prosecutorial vindictiveness and prosecutorial misconduct, to which we now turn.

II

We begin with Meadows' contention that the district court erred in denying her pre-trial motion to dismiss the indictment for prosecutorial vindictiveness. In her view, the government obtained the six-count felony indictment in retaliation for her "unexpected and burdensome assertions of [her] legal rights." Meadows Br. 17-18 (quoting *United States v. Meyer*, 810 F.2d 1242, 1247 (D.C. Cir. 1987)).

A

In *United States v. Safavian*, we set out the analysis this Circuit follows in evaluating such a claim of prosecutorial vindictiveness:

> [T]he doctrine [of prosecutorial vindictiveness] precludes action by a prosecutor that is designed to penalize a defendant for invoking any legally protected right available to a defendant during a criminal prosecution. A defendant may prove prosecutorial vindictiveness by submitting either (i) evidence of the prosecutor's actual vindictiveness or (ii) evidence sufficient to establish a realistic likelihood of vindictiveness, thereby raising a presumption the Government must rebut with objective evidence justifying its action. If the Government can produce objective evidence that its motive in prosecuting the defendant was not vindictive, then the defendant's only hope is to prove that the justification is pretextual and that actual vindictiveness has occurred.

649 F.3d 688, 692 (D.C. Cir. 2011) (per curiam) (citations omitted); *see United States v. Gary*, 291 F.3d 30, 34 (D.C. Cir. 2002); *Maddox v. Elzie*, 238 F.3d 437, 446 (D.C. Cir. 2001); *Meyer*, 810 F.2d at 1245.

"To prove *actual* vindictiveness requires objective evidence that the prosecutor's actions were designed to punish a defendant for asserting his legal rights. Such a showing is normally exceedingly difficult to make." *Gary*, 291 F.3d at 34 (emphasis added) (quoting *Maddox*, 238 F.3d at 446). "To invoke the *presumption* of vindictiveness, we must find that a reasonable likelihood of vindictiveness exists -- that is, that the second indictment was 'more likely than not attributable to the

vindictiveness on the part of' the Government." *Id.* (emphasis added) (quoting *Alabama v. Smith*, 490 U.S. 794, 801 (1989)). "[O]ur concerns over alleged vindictiveness do not relate to whether a prosecutor has acted maliciously or in bad faith, but whether a prosecutor's actions are designed to punish a defendant for asserting her legal rights." *Id.* at 35.

Where the defendant provides evidence sufficient to support a presumption of vindictiveness, the burden shifts to the government to produce "objective evidence" that its motivation in charging the defendant was lawful. *Safavian*, 649 F.3d at 694. That burden is "admittedly minimal -- any objective evidence justifying the prosecutor's actions will suffice." *Id.* If the government meets this burden, the defendant cannot prevail unless she proves that the government's justification was pretextual. *Id.* at 692.

We review a district court's findings regarding vindictiveness only for clear error. *See Gary*, 291 F.3d at 34; *Meyer*, 810 F.2d at 1244-45.

B

The district court concluded that the evidence did not support a claim of actual vindictiveness in this case. "[T]here is nothing on the face of the record," the court held, "to show that defendant's prosecution was initiated to punish her for declining to cooperate with the government or for exercising her constitutional right to go to trial." *United States v. Meadows*, Crim. No. 14-0073, slip op. at 7 (D.D.C. Sept. 23, 2014). Meadows does not contest this point on appeal.

Instead, Meadows proceeds on a theory of presumptive vindictiveness, contending that the government obtained the six-count felony indictment in retaliation for her "unexpected and

burdensome assertions of [her] legal rights." Meadows Br. 17-18 (quoting *Meyer*, 810 F.2d at 1247). The indictment was brought, Meadows' brief claims, because she "was a thorn in the government's side" in the following respects:

> She repeatedly refused to cooperate in the homicide investigation of her boyfriend and, according to the government, hampered that investigation and obstructed justice;
>
> She -- according to the government -- bribed a corrections officer in connection with the Concrete Playground investigation and, when confronted, refused to cooperate in that investigation; and
>
> She allegedly smuggled contraband to her boyfriend in the D.C. Jail while posing as an investigator for a Public Defender's Office and refused to cooperate in his prosecution for that offense.

Meadows Br. 22. After she refused to cooperate, Meadows' brief continues, the government "made two plea offers that [it] unquestionably believed to be more than generous. The first required a plea to a felony and a misdemeanor; the second required only a plea to two misdemeanors. Neither required cooperation in the prosecution of anyone else. But Meadows stuck to her constitutional guns and rejected the offers." *Id.* at 23 (citation omitted). This "contentious history," the brief maintains, "goes a long way to explain why [the prosecutor] charged her with six felonies for conduct that," the defense claims, "is rarely prosecuted and routinely addressed administratively." *Id.* at 23-24.

The district court concluded that Meadows failed to present sufficient facts to raise a "realistic likelihood," *Safavian*, 649

F.3d at 692, of vindictiveness in this case. *Meadows*, slip op. at 7, 9-13. That conclusion was not clearly erroneous. As an initial matter, the Supreme Court has "expressed doubt that in the run-of-the-mill pretrial situation, the prosecutor would have any reason to engage in vindictive behavior; the Court noted that defendants routinely assert procedural rights prior to trial and that prosecutors are unlikely to respond vindictively to this everyday practice." *Meyer*, 810 F.2d at 1247 (citing *United States v. Goodwin*, 457 U.S. 368, 381 (1982)). Nothing in the record suggests that we are "confront[ing] something other than routine invocations of procedural rights" in this case. *Meyer*, 810 F.2d at 1247. To be sure, two plea offers were made and rejected. But, as the Supreme Court held in *Bordenkircher v. Hayes*, "in the 'give-and-take' of plea bargaining, there is no . . . element of punishment or retaliation so long as the accused is free to accept or reject the prosecution's offer." 434 U.S. 357, 363 (1978); *see Goodwin*, 457 U.S. at 378.[1]

Moreover, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher*, 434 U.S. at 364. Meadows does not dispute that there was probable cause to support the indictment in this case. Accordingly, absent unusual circumstances, the government had "every right" to prosecute Meadows for unemployment benefits fraud, regardless of

---

[1] *See also Goodwin*, 457 U.S. at 382-83 ("This Court in *Bordenkircher* made clear that the mere fact that a defendant refuses to plead guilty and forces the government to prove its case is insufficient to warrant a presumption that subsequent changes in the charging decision are unjustified.").

whether it could have prosecuted her for the jail-related offenses. *Gary*, 291 F.3d at 34.[2]

As the district court held in this case, "there must be something more for a presumption to arise." *Meadows*, slip op. at 10 (citing *Meyer*, 810 F.2d at 1246). Meadows claims that there is "something more" here: she claims that she was subjected to "disparate treatment." Meadows Br. 18. It is certainly true that "[s]electivity in the enforcement of criminal laws is . . . subject to constitutional constraints," and that, "[i]n particular, the decision to prosecute may not be deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification." *Wayte v. United States*, 470 U.S. 598, 607 (1985) (quoting *Bordenkircher*, 434 U.S. at 364). And "disparate treatment" among similarly situated defendants can "give rise to a suspicion that the government discriminated among the defendants." *Meyer*, 810 F.2d at 1246.

But Meadows makes no claim of anything like disparate treatment on the basis of race or religion. Instead, her claim is that she was charged with a crime, unemployment benefits fraud, that "is rarely prosecuted and routinely addressed administratively." Meadows Br. 24. While the district court was "troubled by the general lack of similar prosecutions," *Meadows*, slip op. at 13, it certainly did not clearly err in concluding that such disparate treatment was insufficient to warrant a presumption of vindictiveness.

---

[2] In 1931, the government famously prosecuted Al Capone for income tax evasion rather than far more serious crimes that it might have had difficulty proving. *See* LAURENCE BERGREEN, CAPONE: THE MAN AND THE ERA (1994); *see also* THE UNTOUCHABLES (Paramount Pictures 1987). At oral argument, defense counsel agreed that such a prosecution would not be subject to dismissal as vindictive. Oral Arg. Tr. 12-13.

12

To begin with, we agree with the district court that the question in this case is nothing like that in *United States v. Meyer*, the case that Meadows claims is most analogous. In holding that the defendants presented sufficient evidence to support a presumption of vindictiveness in *Meyer*, the court emphasized that its holding was "limited to the precise circumstances of th[e] case; in other cases, with different facts, the presumption may not lie." 810 F.2d at 1248. And the facts in *Meyer* were unusual. The case began with the arrests of approximately 200 political protesters outside the White House. They were all charged with "demonstrating without a permit" and presented with two options: plead guilty and pay a $50 fine, or proceed to trial and risk a $500 penalty and six months in prison. The government persuaded most -- but not all -- to plead guilty and pay the $50 fine. When some of the demonstrators opted to proceed to trial, however, the government brought an additional charge solely against those who insisted on exercising their trial rights. *Id.* at 1243-44.

The first thing to note about *Meyer* is that there the question presented was whether the district court clearly erred in finding prosecutorial vindictiveness. *Id.* at 1245. Here, the question is whether the court clearly erred in *not* so finding. Thus, in this case the deference arrow points in the opposite direction.

In *Meyer*, moreover, the causal link between the defendants' refusal to plead guilty and the prosecutor's decision to "up the ante" by adding an additional charge was sufficient to support a "realistic likelihood of vindictiveness." *Id.* at 1246. In this case, by contrast, the claim of a causal link between Meadows' felony indictment and her allegedly protected conduct is undermined by several facts. Neither of the two preceding plea offers were conditioned on Meadows' cooperation with the government; indeed, the government had obtained convictions in the jail contraband case before Meadows

rejected those offers. *Meadows*, slip op. at 12. And while in *Meyer* the government had a "strong incentive to try to keep clear of th[e] courtroom morass" that would have occurred at a trial of dozens of protesters, 810 F.2d at 1247, there was no similar incentive here.

In *Meyer* there was also no doubt that all of the defendants were similarly situated. They all "participated in the same demonstration and conducted themselves in the same manner." *Id.* at 1246. Yet, only those "who chose to go to trial faced two charges, whereas the other defendants confronted only one." *Id.* Meadows' claim of disparate treatment is substantially weaker. She initially asked the district court to consider a list of 117 unemployment fraud cases that, she told the court, arose during the three years prior to her own indictment, involved overpayments of similar amounts of money, and yet did not result in criminal charges. *See* Def.'s Ex. 1 (A. 116-23). The district court found, however, that "only about 41 of the 117 cases . . . were actually referred by [the Department of Employment Services] for prosecution," and hence only those 41 were even relevant for consideration as comparators of disparate treatment by the prosecutors. *Meadows*, slip op. at 11 n.5. And the court further noted that there was no evidence at all regarding the circumstances of those 41 cases; hence, it could not determine whether those defendants were similarly situated to Meadows. *Id.* at 11. (Meadows herself acknowledged that at least four cases involving unemployment fraud were in fact prosecuted within 10 years preceding her indictment. *See id.* at 11-12.) We thus find no clear error in the court's rejection of Meadows' claim that her allegedly "disparate treatment" gave rise to a presumption of vindictiveness.

Finally, even if a presumption of vindictiveness were warranted, the district court concluded that the government's objective evidence justifying its charging decision was sufficient

to overcome such a presumption. *Id.* at 14-16. Again, we find nothing like clear error. The district court reasonably found that the government's evidence regarding the severity of Meadows' fraudulent conduct -- which "continued for approximately a year, involved two separate false filing schemes, and resulted in approximately 49 false claims," *id.* at 15 -- was sufficient to satisfy this court's "admittedly minimal" requirement of "any objective evidence," *Safavian*, 649 F.3d at 694. The court also reasonably relied on the government's belief that Meadows "participated in the contraband scheme -- another act of dishonesty -- at the same time that she was allegedly engaged in unemployment fraud." *Meadows*, slip op. at 15.

Accordingly, assuming arguendo that a presumption of vindictiveness were warranted, the district court rightly concluded that the government met its burden of producing objective evidence justifying the prosecution's charging decisions. Under those circumstances, "the defendant's only [remaining] hope [was] to prove that the justification [was] pretextual and that actual vindictiveness ha[d] occurred." *Safavian*, 649 F.3d at 692 (citation omitted). Because Meadows offered no such evidence that the court had not already reasonably rejected, we affirm the denial of her motion to dismiss the indictment.

III

We turn next to Meadows' contention that two alleged instances of prosecutorial misconduct prejudiced the outcome of her trial. One was the prosecutor's references to the district court's denial of Meadows' motion to dismiss the indictment. The other was the prosecutor's reference to the probability that the "computer glitch" about which Meadows speculated could have occurred.

15

A

Over the government's objection, the district court permitted Meadows to introduce evidence showing that, by the time the trial began in December 2014, the Department of Employment Services had already recouped the full $14,173 it had overpaid her. Although the district court deemed the relevance of this evidence "marginal," the court admitted it, subject to a jury instruction that repayment was not a defense. Trial Tr. 70 (Dec. 18, 2014). But the district court made clear -- both before Meadows took the stand and again in two bench conferences during her testimony -- that on cross-examination "[t]he door is going to be open" to questions from the government about the "chronology" of events. *Id.* at 70, 72; *see also id.* at 123-35, 131. The questions the court expected the government to ask, it said, would be aimed at showing that Meadows "wouldn't have repaid [the government] but for the charge," *id.* at 75, and "didn't write a check until after there was a ruling" denying her motion to dismiss, *id.* at 70-71.

On cross-examination, the prosecutor did just what the district court predicted. He confronted Meadows with the fact that, between February 2011 when she first became aware of the overpayments, and August 2014 when the district court denied her motion to dismiss Count 5 of the indictment, she did not make voluntary repayments. Pressing the point, the prosecutor asked, and the defense counsel objected, as follows:

> Q. And, in fact, . . . in August of 2014, you, through your lawyer, filed a motion to dismiss this case, isn't that right?
> A. Yes.
> Q. And the judge denied that motion, isn't that right?
> A. Yes.

> Q. And, in fact, there were two such motions, is that correct?
> A. I don't know.
> Q. One had to do with Count 5?
> [DEFENSE COUNSEL]: Objection.
> THE COURT: Ye[s], let's not talk about what it had to do with. That's all legal matters.

*Id.* at 132. The prosecutor made three additional references to the motion during cross-examination, each aimed at illuminating the same point: that Meadows did not make an effort to repay the government until the district court declined to dismiss Count 5. *See id.* at 132-33, 134, 146.

Beyond the above-quoted objection to whether one of the motions involved Count 5, defense counsel did not contemporaneously object to any of these lines of questioning. Following Meadows' testimony, however, her counsel requested a jury instruction to address the prosecutor's references to the denial of the dismissal motion, arguing that, in "add[ing] in [that] the court denied it," the prosecutor may have created "the possibility that [the denied motion] had something to do with guilt or innocence." *Id.* at 160-61. In response to this request, the judge instructed the jury that the denied motion "related to a legal question" and her ruling "had nothing to do with the guilt or innocence of Ms. Meadows or the merits of the case; that is the matter that is being submitted to you." *Id.* at 164. The judge further instructed the jury to "draw no inferences one way or the other with respect to the questions that you have to consider that I denied a motion to dismiss on some other legal question." *Id.* at 165.

During closing rebuttal argument, the prosecutor referred to the denied motion twice more, including in summing up the

government's position on the repayment issue. Trial Tr. 91, 95 (Dec. 22, 2014). The prosecutor stated:

> The bigger point with regards to all of this is that these final payments, August, October, November, when she is actually trying to make repayment, comes after the Judge . . . refused to dismiss the case.

> That's the context in which she makes those payments, no[t] for some year-long effort to try to do right or do good or make repayment. It's a last ditch effort to try to make [her] look good in front of you all, the ladies and gentlemen of this jury.

*Id.* at 95. Defense counsel did not object; nor did the district court intervene. Echoing both its opening and mid-trial instructions to the jury, however, the court restated in its final instructions that the jury should "not take anything I may have said or done as indicating how I think you should decide this case." *Id*. at 103.

On appeal, Meadows contends that, by referring to the district court's decision to deny her motion to dismiss, the prosecutor left the jury with the incurable impression that "the judge believed that Meadows was guilty, or at a minimum, believed the government's version of events." Meadows Br. 31. That was not the nature of the objection defense counsel made during Meadows' testimony, however. There, the sole contemporaneous objection (as set out above) was to a question about the content of the motion to dismiss. Trial Tr. 132 (Dec. 18, 2014). The district court sustained that objection, and it is not at issue on appeal.

Because Meadows did not contemporaneously object to the line of questions, her one objection is insufficient to preserve her

claim on appeal "that the entire line of questioning was improper." *United States v. McGill*, 815 F.3d 846, 876-77 (D.C. Cir. 2016) (per curiam) (internal quotations marks omitted). Accordingly, our review is for plain error only. *See* FED. R. CRIM. P. 52(b); *United States v. Morton*, 391 F.3d 274, 276-77 (D.C. Cir. 2004) (holding that, when "an appellant failed to raise a contemporaneous objection at trial," a defendant "must demonstrate that the trial court committed [] plain error"). Under that standard, "there must be (1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Johnson v. United States*, 520 U.S. 461, 467 (1997) (citations and alterations omitted); *see* FED. R. CRIM. P. 52(b). In most cases, to affect the defendant's substantial rights, "the error must have been prejudicial: It must have affected the outcome of the district court proceedings." *United States v. Olano*, 507 U.S. 725, 734 (1993). Under the plain-error standard, it "is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice." *Id.*

For purposes of this discussion, we will assume that the government's references to the denial of the motion to dismiss constituted error. There is, however, reason to doubt such an assumption. The court warned Meadows that her effort to portray herself as making good-faith repayment would open the door to cross-examination intended to show that she "didn't write a check until after there was a ruling . . . in this case." Trial Tr. 71 (Dec. 18, 2014). Meadows proceeded nonetheless, and in so doing "opened the door" for questions designed "to prevent the jury from being misled." *United States v. Powell*, 334 F.3d 42, 48 (D.C. Cir. 2003); *see United States v. Fonseca*, 435 F.3d 369, 375 (D.C. Cir. 2006); *Griffin v. Washington Convention Ctr.*, 142 F.3d 1308, 1312 (D.C. Cir. 1998).

But even if the references to the denied motion to dismiss were erroneous, any error here was not "plain." For an error to be "plain," it must be "clear" or "obvious." *Olano*, 507 U.S. at 734. That requires either "controlling precedent on the issue or some other absolutely clear legal norm." *United States v. Williams*, 773 F.3d 98, 105 (D.C. Cir. 2014) (citation omitted); *see United States v. Nwoye*, 663 F.3d 460, 466 (D.C. Cir. 2011); *In re Sealed Case*, 573 F.3d 844, 851 (D.C. Cir. 2009). And no such precedent or legal norm bars prosecutors from eliciting testimony about a dismissal motion when a defendant opens the door in the manner that Meadows did.

Nor did the references to the denied motion prejudice Meadows because any prejudice was extinguished by the district court's instructions. As noted above, Meadows' contention is that those references left the jury with the impression that "the judge believed that Meadows was guilty, or at a minimum, believed the government's version of events." Meadows Br. 31. But the court expressly instructed the jury, immediately after the prosecutor's references, that the denied motion "related to a legal question" and "had nothing to do with the guilt or innocence of Ms. Meadows or the merits of the case; that is the matter that is being submitted to you." Trial Tr. 164 (Dec. 18, 2014). And in both its mid-trial and final instructions, the district court further warned the jury against drawing any inferences from its actions. *See id.* at 164-65 ("[Y]ou should draw no inferences one way or the other with respect to the questions that you have to consider that I denied a motion to dismiss on some other legal question."); Trial Tr. 103 (Dec. 22, 2014) ("You may not take anything I may have said or done as indicating how I think you should decide this case."). This court has consistently reaffirmed the principle that "[t]he jury is presumed to follow the instructions" it is given. *United States v. Hall*, 610 F.3d 727, 742 (D.C. Cir. 2010) (citing *Greer v.*

*Miller*, 483 U.S. 756, 766 n.8 (1987)).  And there is no reason to think otherwise in this case.

B

Meadows' second misconduct claim is that the prosecutor made a "probability" analysis during closing rebuttal that prejudiced the outcome of her trial.  *See* Meadows Br. 33-46. Meadows' defense to the charge of fraudulent payment was that she did, in fact, report both her full-time FDA job and her earnings on each of the weekly claim forms she submitted to the Department of Employment Services.  Specifically, Meadows testified that, in response to Question 2 on each of the 49 weekly forms she submitted online, she answered "Yes" to whether she had "perform[ed] work" during the preceding week and entered "the weekly wages that [she] earned."  Trial Tr. 90, 107 (Dec. 18, 2014).  On cross-examination, she was confronted with documents showing that the reports the government received did not contain those answers.  Meadows responded that a computer glitch must have caused the same error to appear on each of the 49 separate forms she submitted.  She presented no evidence to corroborate that claim.

In his closing rebuttal argument, the prosecutor attacked the plausibility of Meadows' suggestion that there must have been a computer glitch.  To that end, the prosecutor asked the jury: "What are the odds that this magical computer glitch could affect Ms. Meadows, and Ms. Meadows alone, 49 weeks in a row, given what you've heard in this case?"  Trial Tr. 79 (Dec. 22, 2014).  After walking through the evidence and saying that the likelihood of such an error was "[o]ne in nearly 60 million," the prosecutor added that he was "speak[ing] broadly" and that "the odds are astronomical that this could ever have taken place."  *Id.* at 81.  "[I]t is in the extreme, it is absurd, because it's just not reality."  *Id.*

On appeal, Meadows objects to the prosecutor's discussion of "probability," Meadows Br. 19, in his closing rebuttal. She concedes that she did not object to the discussion in the district court. Accordingly, our review is again for plain error only. *See* Meadows Br. 34 & n.10 ("The defense made no objection to this argument, and this Court therefore reviews for plain error."); *see also* FED. R. CRIM. P. 52(b).[3]

Meadows' principal contention is that the prosecutor's "one in nearly 60 million" figure was not supported by trial evidence. In context, however, that figure was nothing more than a rhetorical flourish ("astronomical!", "absurd!") to the prosecutor's argument that it was unlikely that a computer glitch -- rather than the defendant's actions -- could explain the responses that appeared on Meadows' weekly claim forms. Meadows has not shown that reasonable jurors would have understood the prosecutor's statement otherwise, and thus has not shown that it "affected the outcome of the district court proceedings," *Olano*, 507 U.S. at 734, or that it "seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings," *id*. at 736 (citation omitted).

Meadows also contends, more broadly, that "statistical arguments should most likely never be used to argue a defendant's guilt in a criminal trial, and if such arguments are going to be used, they need to be presented through a properly qualified expert." Meadows Reply Br. 14. Because the prosecutor's rhetoric did not amount to a "statistical argument," those contentions fail. In any event, there is again no "controlling precedent . . . or . . . other absolutely clear legal norm" on either issue, *Williams*, 773 F.3d at 105. *See* Meadows

---

[3] Because our review is for plain error only, the balance of this opinion is not intended to suggest that the prosecutor's argument was proper. Rather, we hold only that it did not constitute plain error.

Reply Br. 14 (stating that the question of whether a statistical argument is permissible is "of first impression in this Circuit"); Oral Arg. Tr. 24-25 (acknowledging that whether such an argument must be offered through expert testimony is "a case of first impression").

Finally, Meadows contends that the prosecutor's "one in nearly 60 million" statement "redefine[d] 'proof beyond a reasonable doubt'" and therefore diluted the government's burden of proof. Meadows Br. 42. As defense counsel conceded at oral argument, however, the prosecutor never related his rhetoric to the proof-beyond-a-reasonable-doubt standard, as the prosecutor expressly did in the only case upon which Meadows relies. Oral Arg. Tr. 22; s*ee Commonwealth v. Ferreira*, 955 N.E.2d 898, 904 (Mass. 2011) (holding that the prosecutor erred in "equating proof beyond a reasonable doubt with a numerical percentage of the probability of guilt").

Although we find no plain error in this case, we do caution the government that there is a considerable risk of error -- and prejudice -- when a prosecutor attempts to offer a true statistical analysis, unsupported by expert testimony, in closing argument. Moreover, if a defense counsel contemporaneously objects, then it is the government that will bear the burden of proving that the error did not prejudice the defendant. *Olano*, 507 U.S. at 734.

IV

For the foregoing reasons, the judgment of the district court is affirmed.

*So ordered.*

ROGERS, *Circuit Judge*, concurring in part and concurring in the judgment. Meadows has challenged three rulings by the district court: denial of her motion to dismiss the indictment as the product of vindictive prosecution; allowing the government, during Meadows' cross examination, to refer to that denial; and allowing the government to make an improper closing argument based on mathematical probability. I concur in the court's disposition of her second challenge. Op. 14-20. As to her first and third challenges, I concur in part. For the first challenge, the court need only decide, assuming a presumption of vindictiveness, whether the government has satisfied its "minimal" burden to offer "any objective evidence justifying the prosecutor's actions," *United States v. Safavian*, 649 F.3d 688, 694 (D.C. Cir. 2011); it has, and Meadows does not contend she provided any evidence of "actual vindictiveness," *see United States v. Meyer*, 810 F.2d 1242, 1245 (D.C. Cir. 1987). *See* Op. 13-14. My analysis of her third challenge differs from that of the court. Given well-settled law, the prosecutor's probability theory first presented in rebuttal closing argument to the jury cannot be excused as merely a "rhetorical flourish." Op. 21. In the absence of evidence to support the theory as presented, the error was "plain." *United States v. Olano*, 507 U.S. 725, 734 (1993). I nevertheless concur in the judgment because Meadows fails to show the requisite prejudice to obtain reversal of her convictions.

## I.

The court affirms the district court's ruling that there was not a realistic likelihood of vindictiveness because nothing more is involved than a "run-of-the-mill pretrial situation," *see* Op. 10 (quotation omitted), and because Meadows' "disparate treatment" argument lacked merit, *id.* at 13. This court recently acknowledged again that Supreme Court precedent leaves little room for a defendant to demonstrate prosecutorial vindictiveness at the pretrial stage. *See United States v. Slatten*,

Slip. No. 15-3078, at 47 (D.C. Cir. Aug. 4, 2017) (citing *United States v. Goodwin*, 457 U.S. 368 (1982)). Still, it is unclear Meadows' circumstances involved no more than a run-of-the-mill situation.

In explaining the government's decision to charge Meadows with six counts of unemployment fraud, the Assistant United States Attorney told the district court judge that all other suspects involved in the D.C. Jail contraband scheme "have either been found guilty or plead [sic] guilty. We have just one person – Ms. Meadows – who's still hanging out there . . . . We can't just walk away from that." Hearing Tr. 22 (Aug. 12, 2014). Additionally, Meadows presented evidence that the United States Attorney's Office rarely prosecutes unemployment fraud; her case was the single unemployment fraud prosecution in four years even though the D.C. Department of Employment Services had referred more than 30 cases to the Office for prosecution involving amounts greater than the $14,173 Meadows owed. *See* Def.'s Ex. 1 (A. 116-23). True, Meadows did not show she was treated differently from others who "participated in the same [offense] and conducted themselves in the same manner." *Cf.* Op. at 13 (quoting *Meyer*, 810 F.2d at 1246). But the issue is whether "all of the circumstances, when taken together, support a realistic likelihood of vindictiveness." *Meyer*, 810 F.2d at 1246.

Here, the circumstances could suggest that the prosecutor had a "personal stake in [obtaining a] conviction and [a] motivation to engage in self-vindication." *Safavian*, 649 F.3d at 692 (quoting *United States v. Stanfield*, 360 F.3d 1346, 1362 (D.C. Cir. 2004)). In addition to the government's indictment of Meadows for obstruction of justice when she repeatedly refused to cooperate in the investigation of her boyfriend for murder, prosecutorial frustration was evident from Meadows' refusal to plead to the contraband charges. Arguably it was

evident as well from the Office's pursuit of rarely prosecuted unemployment fraud charges. Indeed, the district court judge inquired, if the government was so interested in punishing Meadows for her role in the contraband scheme, then "why do you not charge her with *that*?" Hearing Tr. at 22 (Aug. 14, 2014) (emphasis added).

But even assuming that Meadows established a presumption of vindictiveness as to the unemployment fraud charges, *see* Op. 13-14, the government offered objective evidence, *see Safavian*, 649 F.3d at 694, that its charging decision was based on a different "act of dishonesty" by Meadows, Op. 14 (quoting Mem. Op. 15), rather than Meadows' repeated invocation of her legal rights in the contraband scheme or murder investigation. For this reason, I concur in holding her prosecutorial vindictiveness challenge fails.

## II.

The prosecutor's error in rebuttal closing argument is not so easily dismissed. First, it is well established that counsel may not argue facts that are not supported by evidence before the jury. *United States v. Maddox*, 156 F.3d 1280, 1282 (D.C. Cir. 1998) (collecting cases). Recently the court repeated "that the prosecutor may not refer in the opening or closing statement to evidence not admitted at trial." *United States v. Davis*, Slip No. 15-3044, at 9 (D.C. Cir. July 21, 2017) (quoting *United States v. Valdez*, 723 F.3d 206, 209 (D.C. Cir. 2013)); *see also United States v. McGill*, 815 F.3d 846, 916 (D.C. Cir. 2016) (quoting *United States v. Jones*, 482 F.2d 747, 753 (D.C. Cir. 1973)). The reason is self-evident if a defendant is to receive a fair trial and justice be done. *See Berger v. United States*, 295 U.S. 78, 88 (1935). Consequently, repeated prosecutorial overreaching during rebuttal closing arguments to the jury is disheartening. *See, e.g.*, *United States v. Williams*, 836 F.3d 1, 11-12 (D.C. Cir.

2016); *McGill*, 815 F.3d at 918-19; *United States v. Becton*, 601 F.3d 588, 593-94, 598 (D.C. Cir, 2010); *United States v. Williams*, 212 F.3d 1305, 1310-11 (D.C. Cir. 2000). Second, as the last word the jury hears from the parties, the government's rebuttal closing argument can be appropriately forceful in responding to the defendant's closing argument. At the same time and for the same reason, "the potential for prejudice from an impermissible [rebuttal] closing statement is heightened." *Davis*, No.15-3044, at 20 (citing *United States v. Holmes*, 413 F.3d 770, 776 (8th Cir. 2005) (collecting cases)). When counsel for the parties confine their remarks to the evidence admitted at trial, and reasonable inferences therefrom, the justice system should work as intended. But when, as here, the rebuttal closing argument launches into new terrain and the sandbagging of the defendant is evident, a court must evaluate the likely prejudice to a defendant with considerable care. *See McGill*, 815 F.3d at 918; *cf. United States v. Moore*, 651 F.3d 30, 50-51 (D.C. Cir. 2011).

Today the court takes the position that the prosecutor's use of numbers to calculate probability during rebuttal closing argument was merely a "rhetorical flourish." Op. 21. *But cf. Davis*, No. 15-3044, at 20 (quoting *United States v. Monaghan*, 741 F.2d 1434, 1440 (D.C. Cir. 1984)). Perhaps had the Assistant U.S. Attorney told the jury in rebuttal closing argument that "there is a one in a ga-zillion chance," or even "a one in a billion chance," that the computer glitch occurred as Meadows testified, then a court might dismiss her objection as a grandiose or a stylistic form of rhetoric. But that is not what occurred at Meadows' trial. During rebuttal closing argument, the prosecutor introduced his probability theory in a deliberate and detailed manner, presenting a step-by-step calculation for the jury in attacking Meadows' defense. Trial Tr. 79-81 (Dec. 22, 2014). To determine "the odds" that a computer glitch affected Meadows and only Meadows, the prosecutor told the jury that

first, he multiplied the 49 weeks that Meadows applied for unemployment by the 20,000 claims submitted each week. Second, that he multiplied that number by the "61 key strokes that Ms. Meadows had to make as she sits at her computer entering her name, the Social Security number, the week ending days, her e-mail address, plus the six questions [concerning her eligibility]." Third, that he found a "one in nearly 60 million" chance by dividing 1 by the product of the multiplication at the first two steps. As presented, the prosecutor's probability theory was more like an indisputable mathematical formula than a permissible rhetorical flourish supported by the evidence. Yet because the theory was unsupported by evidence, the prosecutor's argument was impermissible under well-settled controlling precedent, *see supra* at 3, making the error "plain," *see United States v. Williams*, 773 F.3d 98, 105 (D.C. Cir. 2014) (citation omitted). Further, the prosecutor's statements on probability were both flawed and presented for the first time during rebuttal closing argument.

Implicitly, the prosecutor's calculation assumed that no other glitches of any kind for any other applicant occurred during the relevant 49-week period. Yet no such evidence was before the jury. At most, a software technician at the Department of Employment Services testified that he was unaware of any widespread computer problems and thought a systemic problem would have been uncovered during the annual audit. Trial Tr. 32-33, 40-41 (Dec. 18, 2014). But a lack of widespread problems would not invariably mean no other errors occurred in the computer system. Indeed, problems with the computer system and website were apparently common enough for the Department to establish a streamlined process for applicants to submit "ticket[s]" to report computer problems to the technicians who were to "fix[] [such] issues" as they arose. *Id.* at 40-41. Because the Department deletes records of specific computer problems after three years, no records were before the jury on the

number of computer errors in 2009 when Meadows was submitting claims.  Trial Tr. 175 (Dec. 17, 2014).

Additionally, the prosecutor's calculation based on no evidence presented a risk of juror confusion. The prosecutor purported to determine "the odds" that a glitch had occurred as Meadows described.  Trial Tr. 79 (Dec. 22, 2014).  What he really did, however, was assume that a glitch occurred as Meadows described and that no other glitches occurred during that time, and then calculate the error rate based on those assumptions.  Oral Arg. 34:07–36:28.  Given the subtle distinctions between error rates and the probability an error occurred, and the consequent potential for juror confusion, it may well be that any "analysis of mathematical probability . . . must be offered through expert testimony." *Commonwealth v. Ferreira*, 955 N.E. 2d 898, 903 (Mass. 2011); *see* Op. 22.  None was offered at Meadows' trial, and no other evidence supported the prosecutor's newfound theory and its assumptions.

The government responds that the standard jury instructions at the end of the trial before the jury retired to deliberate "alleviated any potential prejudice arising from the prosecutor's mathematical argument."  Appellee's Br. 70.  The standard instruction does inform the jury that arguments of counsel are not evidence. Such generic instructions are not inevitably "a cure-all for an erroneous statement." *United States v. Hall*, 610 F.3d 727, 742 (D.C. Cir. 2010).  Here, the jury "instructions d[id] not address the prosecutor's error in [rebuttal] closing argument, and the error affect[ed] a central issue," namely Meadows' defense to the charges. *United States v. Williams*, 836 F.3d 1, 16 (D.C. Cir. 2016) (quoting *United States v. Watson*, 171 F.3d 695, 702 (D.C. Cir. 1999)).

Nevertheless, Meadows has not met her burden to show prejudice under a plain error standard of review. The

government's case against her was hardly close; it was overwhelming. Put otherwise, the error did not affect the outcome of her trial. *See United States v. Gartmon*, 146 F.3d 1015, 1026 (D.C. Cir. 1998). Meadows' testimony about a computer glitch causing her false responses on 49 occasions was facially dubious absent any supporting evidence. The software technician testified that the "glitch" she described would have been "an error in programming and . . . more systemic than just a one-off occurrence," Trial Tr. 180 (Dec. 17, 2014); no evidence showed an audit had uncovered such a computer problem. At sentencing, the district court judge even found that Meadows had perjured herself. Sent. Hg. Tr. 12-13 (July 16, 2015). Regardless, based on the evidence before the jury, there is no basis on which the court could conclude that the prosecutor's probability theory affected a reasonable jury's rejection of Meadows' bare assertion that she was the repeated victim of a computer glitch.

Accordingly, I concur in part and I concur in the judgment affirming Meadows' convictions.